# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1716
_____

United States of America

*Plaintiff - Appellee*

v.

John Ways, Jr., also known as John Blacksteel

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of Nebraska - Omaha
_____

Submitted: February 12, 2016
Filed: August 11, 2016
_____

Before SHEPHERD, BEAM, and KELLY, Circuit Judges.
_____

KELLY, Circuit Judge.

John Ways appeals from his convictions for conspiracy to sell drug paraphernalia, conspiracy to distribute Schedule I controlled substances, conspiracy to commit money laundering, and being a felon in possession of ammunition, as well as the associated forfeiture. Upon careful consideration of the issues presented, we reverse Ways' conviction for being a felon in possession of ammunition and otherwise affirm the judgment of the district court.

## I. Background

This case stems from Ways' operation of four shops in Iowa and Nebraska. The shops were called Exotica, and were located in Sioux City, Council Bluffs, and Omaha. The Exotica stores were what are commonly referred to as "head shops."[1] Ways' stores typically[2] had two separate areas—for example, the Sioux City shop had a main floor, accessible from the street, and a basement area. The main area of the stores offered clothing, posters, tobacco products, knickknacks, and other novelties for sale. The second, less accessible area (usually the basement or a back room) was referred to as the "pipe room," and had display cases offering various pipes and other drug paraphernalia for sale. Before a customer was allowed to enter the pipe room, they were required to provide identification and read a list of words that were not permitted to be used in the store. The list of prohibited words included a variety of common slang terms for drugs and drug paraphernalia, such as "bong" and "meth pipe." Various substances were also available for purchase. If the substances were legal, they were sold for human consumption; but if they were controlled substances, they were sold under such names as "glass cleaner" or "herbal incense." For example, when the substance K2, a synthetic cannabinoid, was criminalized, Ways continued to sell it in his shops under the label "aromatherapy" or "herbal incense." This and other "herbal incenses" sold at Ways' shops ranged in price from approximately $40–$100 per gram.

Focusing on the drug paraphernalia and the substances sold there, the Bureau of Alcohol, Tobacco, and Firearms (ATF) began an investigation into Ways' Exotica shops. The investigation included several purchases made by undercover ATF agents between April and September 2012, as well as several controlled buys made by a

---

[1]Merriam-Webster's Collegiate Dictionary defines head shop as "a shop specializing in articles (as hashish pipes and roach clips) of interest to drug users."

[2]The Council Bluffs store apparently had only one room.

cooperating informant between May and August 2012. Based in part on the evidence gathered during these buys, on September 13, 2012, search warrants were executed on Ways' four shops as well as at his residence. Officers seized various items of paraphernalia, substances offered for sale, computers, money, and financial records from the shops. At Ways' residence, officers seized forty boxes of 5.56 millimeter (.223 caliber) ammunition. A second set of search warrants was executed on December 21, 2012. Again, officers seized paraphernalia including pipes, bongs, scales, grinders, and concealment containers, as well as financial records, money, and substances offered for sale.

Ways was ultimately charged with conspiracy to sell drug paraphernalia (Count 1), conspiracy to distribute Schedule I controlled substances (Count 2),[3] conspiracy to commit money laundering (Count 3), and being a felon in possession of ammunition (Count 4). The superseding indictment also included a forfeiture allegation. After his indictment, Ways moved to suppress the evidence seized pursuant to the September and December search warrants, arguing that the warrants were not supported by probable cause. The district court denied Ways' motion, and the case proceeded to trial.

After a 13-day trial, the jury returned a verdict of guilty against Ways on all counts. The jury also returned a verdict of forfeiture. The property forfeited included

---

[3]The drugs were identified in the superseding indictment as 3,4-methylenedioxypyrovalerone (MDPV), 3,4-methylenedioxy-N-methcathinone (Methylone), 1-pentyl-3-(4-methl-1-naphthoyl)indole (JWH-122), 1-pentyl-3-(2-methoxyphenylacetyl)indole (JWH-250), 1-pentyl-3-(1-naphthoyl)indole (JWH-018), 1-pentyl-3-(2-chlorophenylacetyl)indole (JWH-203), and 1-(5-fluoropentyl)-3-(1-naphthoyl)indole (AM2201). MDPV and Methylone are hallucinogenic substances, and JWH-122, JWH-250, JWH-018, JWH-203, and AM2201 are cannabimimetic agents. All are Schedule I controlled substances. 21 U.S.C. § 812 (MDPV, JWH-122, JWH-250, JWH-018, JWH-203, AM2201); 21 C.F.R. § 1308.11 (Methylone).

money seized from Ways' shops and his bank accounts, drug paraphernalia, ammunition and gun safes, two vehicles, and various computers and computer equipment. On December 31, 2014, the district court entered a preliminary order of forfeiture. On March 27, 2014, the district court sentenced Ways to 36 months' imprisonment on Count I of the indictment, 180 months' imprisonment on Counts II and III, respectively, and 120 months' imprisonment on Count IV, all to run concurrently. Judgment, including a final order of forfeiture, was entered on March 30, 2014. On appeal, Ways challenges the district court's denial of his motion to suppress, asserts that there was insufficient evidence to support his conviction on all four charges, and argues that the forfeiture of his property was not supported by sufficient evidence.[4] We address each issue in turn.

## II. Motion to Suppress

Ways asserts that the search warrants[5] in this case were not supported by probable cause, and that the district court therefore erred in denying his motion to suppress. In reviewing a district court's denial of a motion to suppress, we review legal conclusions de novo and factual determinations for clear error. United States v. Ingram, 594 F.3d 972, 976 (8th Cir. 2010). Ways argues first that the warrants were defective because some of the information in the affidavits supporting the warrants was provided by an insufficiently reliable informant. Whether an affidavit provides probable cause for issuance of a search warrant is determined based on the totality of the circumstances. United States v. Gladney, 48 F.3d 309, 312 (8th Cir. 1995). The totality of the circumstances includes "the veracity and basis of knowledge" of

---

[4]We note that Ways filed a supplemental pro se appeal brief, as well as a supplemental addendum and a pro se 28(j) letter. We have reviewed and considered all pro se filings in resolving this appeal.

[5]Nineteen different warrants were issued and executed in this case, eleven in September and eight in December. Ways draws no distinctions between the individual warrants in challenging their validity, leaving us to treat them collectively.

informants, id. (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983) (internal quotations omitted)), and "[w]here probable cause depends upon information supplied by an informant, '[t]he core question . . . is whether the information is reliable.'" United States v. Keys, 721 F.3d 512, 518 (8th Cir. 2013) (second two alterations in original) (quoting United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993)). Among other things, independent corroboration may demonstrate an informant's reliability. See id.

Here, ATF agent Paul White completed an affidavit in support of each warrant application. The relevant affidavits stated that an informant had been used to conduct controlled buys of suspected illegal substances from Ways' shops. The affidavits further stated that the informant had "been used extensively" by ATF and the Omaha Police Department "for a period of several years and has always been considered reliable." More importantly, the affidavits stated that White and other ATF agents had also made undercover buys from Ways' shops, and described the parallel financial investigation into Ways and his businesses. The affidavits stated that the financial investigation revealed large deposits into several personal and business accounts, and that an ATF investigator had determined that checks drawn on those accounts were written to sellers of drug paraphernalia.

The district court concluded that the affidavits were sufficient to establish probable cause, and we agree. The court found that the informant had provided reliable information in the past, that the information given in this case was corroborated by the undercover buys made by ATF agents, and that the evidence gathered through the buys was corroborated by the financial investigation. These factual determinations are not clearly erroneous, and support the conclusion that the affidavits provided probable cause in support of the warrants. Ways' argument to the contrary essentially amounts to an attack on the informant's credibility; he notes that the informant had been previously convicted of felony offenses, and had served as an informant on prior occasions to "work off" criminal charges. While the credibility of

the informant is an appropriate factor to consider, simply arguing that the informant is not credible is insufficient to render the district court's factual determinations clearly erroneous.  See Gladney, 48 F.3d at 313 ("When an informant's information is at least partly corroborated, as it was in the instant case, 'attacks upon credibility and reliability are not crucial to the finding of probable cause.'" (quoting United States v. Humphreys, 982 F.2d 254, 259 (8th Cir. 1992))).

Second, Ways argues that the search warrants were defective because the controlled substances he was charged with distributing were not defined as Schedule I drugs until October 1, 2012—after the controlled buys took place and the warrants were issued.  Therefore, he argues, there could have been no probable cause to believe that illegal activity was occurring at the time the warrants were applied for and issued.  Ways' argument turns on the effective date of the Synthetic Drug Abuse Prevention Act of 2012 (SDAPA).  SDAPA was intended to combat the rising use of synthetic drugs and, in part, amended the statutory drug schedules codified at 21 U.S.C. § 812 to add certain synthetic drugs to Schedule I.  Among the synthetic drugs added to Schedule I were JWH-018, JWH-205, JWH-122, AM2201, JWH-203, and MDPV, all of which are cannibimimetic agents.  Before the effective date of SDAPA, these substances were not classified as Schedule I drugs, and their distribution would have been unlawful only if they were controlled substance analogues intended for human consumption.  See 21 U.S.C. § 813 ("A controlled substance analogue shall, to the extent intended for human consumption, be treated, for purposes of any Federal law as a controlled substance in schedule I.").

Ways asserts that SDAPA's effective date was October 1, 2012, and that distribution of the drugs it placed on Schedule I could not create probable cause for illegal activity before that date.  However, SDAPA was *enacted* on July 9, 2012, as Subtitle D of Title XI of the FDA Safety and Innovation Act of 2012.  Synthetic Drug Abuse Prevention Act, Pub. L. No. 112–144, 126 Stat. 993, 1130 (2012).  Though Titles I, II, III, and IV of that Act specified October 1, 2012, as their effective date,

Titles V–XI had no specified effective date. Id. at 1002, 1007, 1024, 1039. Further, the effective dates in Titles I–IV were limited by their terms to the titles in which they appeared. Id. When a statute does not specify its effective date, and there is no clear congressional directive to the contrary, the statute takes effect on the date it is enacted. Johnson v. United States, 529 U.S. 694, 702 (2000). The statutory title of which SDAPA is a part had no specified effective date and, if anything, the legislative history reflects an intention that the ban on various synthetic drugs be effective immediately. See, e.g., 158 Cong. Rec. S4449-01 (2012) (statement of Sen. Grassley). We therefore conclude that SDAPA's effective date was July 9, 2012.

Ways correctly points out that a significant portion of the investigation in this case took place before July 9, 2012. We agree that an investigation involving undercover buys that revealed *only* the sale of lawful substances would not provide probable cause for issuance of a search warrant. But the substances sold at Ways' shops included JWH-018, JWH-205, JWH-122, AM2201, JWH-203, and MDPV, which he does not dispute were controlled substance analogues even before SDAPA's enactment. See 21 U.S.C. § 802(32); 21 U.S.C. § 813. Methylone was also temporarily identified as a Schedule I drug in October 2011, pursuant to the temporary scheduling provisions of 21 U.S.C. § 811(h). See 21 U.S.C. § 811; 21 C.F.R. § 1308.11(d)(47). So, even before SDAPA's enactment, distribution of these substances was unlawful under some circumstances. Moreover, SDAPA did not affect the legality of the drug paraphernalia sold at Ways' shops—the sale of drug paraphernalia was undisputedly unlawful at all times during the investigation into Ways' business.

Ultimately, Ways' argument fails to appreciate the distinction between conduct that is the proper subject of investigation and conduct that is the proper subject of indictment. Even pre-SDAPA, distribution of controlled substance analogues was unlawful if they were "intended for human consumption." See 21 U.S.C. § 813. True, Ways was not ultimately indicted under the analogue statute. But the indictment was based on what the investigation revealed, and does not mean that Ways' conduct was

not properly the subject of a pre-SDAPA investigation. And the conduct for which he was ultimately actually indicted was, in fact, unlawful at the time it occurred.[6]

The execution of a search warrant—so long as it is supported by probable cause—may reveal the expected criminal conduct, criminal conduct other than what was expected, or no criminal conduct at all. Here, the undercover buys, in combination with the financial information, provided probable cause to believe that evidence of one or more crimes would be found at Ways' shops and at his home. The district court did not err in finding that probable cause supported the search warrants in this case, and in denying Ways' motion to suppress.

## III. Sufficiency of the Evidence

Ways next asserts that there was insufficient evidence to sustain his convictions and that the district court erred in denying his motion for acquittal. We review the sufficiency of the evidence to sustain a conviction de novo, viewing the evidence in the light most favorable to the jury's verdict and reversing the verdict only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. United States v. Cole, 721 F.3d 1016, 1021 (8th Cir. 2013). Ways challenges, with varying degrees of specificity, the sufficiency of the evidence as to all four counts.

As to Count 1, Ways asserts that there was insufficient evidence for the jury to find that the items sold in his shops were drug paraphernalia. We disagree. Each shop had signs posted (at least one of which was entitled "Watch Your Mouth!") listing words customers were not allowed to say inside the shop, including common terms for drug paraphernalia. When ATF agent White, during an undercover buy, asked to see the bongs available for purchase and pointed to a large glass bong with the word

---

[6]Ways was charged for distribution that began "at least as early as" July 9, 2012, rather than for distribution of controlled substance analogues before that date.

-8-

"Zong" on it, Ways told the agent: "I don't know what you think you saw but we don't sell bongs here and you can't say bongs so you need to watch what you're saying [in the shop]." Ways also sold various concealment containers. At one of the Omaha shops, White saw a sign advertising "Containers For Your Stash." White then purchased a can that was designed to look and feel like a full can of Diet Coke but contained a space to hide small items. White also bought a pipe that looked like a package of dental floss. Ways argues the government offered no evidence that he himself gave customers any instructions about how to use the items sold at his shop, but the evidence showed that Ways expressly instructed his employees *not* to speak with customers about what they were likely to do with the items they purchased. That way, according to one employee, they couldn't be accused of knowingly selling illegal drug paraphernalia. Based on the evidence presented at trial, a jury considering "all . . . logically relevant factors" could reasonably have concluded that many of the items sold in Ways' shops were indeed drug paraphernalia. See 21 U.S.C. § 863(e).

Next, Ways argues that there was insufficient evidence for the jury to find that he knew the substances he was selling were controlled substances, as required for a guilty verdict on Count 2. To establish knowledge under 21 U.S.C. § 841(a), there must be evidence that the defendant either knew that the substance in question was a controlled substance, or that he knew the identity of the substance. McFadden v. United States, 135 S. Ct. 2298, 2305 (2015). Ways argues that there was no evidence of his knowledge; he points out that there was, in fact, evidence that he had attempted to make sure his shops were in compliance with the law. We consider the sufficiency of the evidence on this count a somewhat closer question, particularly because Ways apparently communicated openly with his federal probation officer about his business.[7] The probation officer visited one of Ways' shops on multiple occasions, sometimes in the company of other federal probation officers or local police. Ways

---

[7]We note that Ways does not raise this fact in the context of a legal defense—i.e., mistake of law—but rather only as additional evidence that he did not know the substances sold at his shops were controlled substances.

also worked with an attorney and an accountant, ostensibly in an effort to make sure he was not in violation of the law. Evidence of knowledge, particularly in cases involving synthetic drugs or analogues, may include "a defendant's concealment of his activities [and] evasive behavior with respect to law enforcement," neither of which were present here. United States v. Ramos, 814 F.3d 910, 917 (8th Cir. 2016) (quoting McFadden, 135 S. Ct. at 2304 n.1).

While the evidence Ways points to supports his claim that he did not know he was selling controlled substances, there was also substantial evidence to the contrary. During the course of the undercover buys made by ATF agents, Ways' employees checked the agents' identification and directed their attention to the posted signs forbidding the use of various drug-related terms in the shop. The employees then provided advice on how to use the various substances available for purchase, and they sold the agents a variety of them. For example, in June 2012, ATF agent White purchased two packets marked "Eight Ballz Premium Glass Cleaner" and one packet marked "Crystaal Bubbly Glass Cleaner" for a total of $190.11. As White left the store, the employee who sold him the packets advised him that once he got used to using the Eight Ballz, he should combine it with the Crystaal Bubbly for a "whole new level." During one of the cooperating informant's controlled buys, Ways himself sold the informant several different substances, some of which tested positive for JWH-018, AM2201, JWH-122, JWH-250, JWH-210, and JWH-081—all of which are Schedule I controlled substances. On one occasion, Ways told the informant that the substance he was purchasing, which was tested to contain alpha-PVP, would "Cheech and Chong" him. On another occasion, Ways sold the informant K2, cautioning him that it was "ten times more powerful than anything Mother Nature can make." One of Ways' employees testified that when K2 became illegal, Ways told them to continue selling it, but under the name "aromatherapy" or "herbal incense."

Substances in Ways' shops were also sometimes sold in unmarked packages. An employee testified that Ways told him the packages were unmarked so that

customers "[wouldn't] know who to sue" if the substances affected them adversely. The same employee testified that Ways gave him a substance called Blue Velvet (which was later determined to contain Methylone) and told him not to get caught with it. Finally, an employee testified that Ways kept lab reports, ostensibly indicating that the substances he was selling did not contain certain controlled substances, in the shops so that they could be shown to anyone who "came in asking questions." Based on this evidence, as well as the evidence supporting Count 1, a reasonable jury could have concluded that Ways knew that some of the substances sold in his shops were controlled substances. The evidence did suggest that Ways did not try to hide his activities from law enforcement, including his own federal probation officer.[8] But the jury heard this evidence and was apparently not persuaded that Ways' communications with legal and business professionals and any tacit approval of his probation officer meant that Ways didn't know what he was selling at the Exotica stores.

With regard to Count 3, Ways asserts generally that there was no evidence he knew that the identified transactions involved the proceeds of unlawful activity, and no evidence that the transactions were knowingly designed to conceal the nature, source, ownership, or control of the money. See 18 U.S.C. § 1956(a)(1)(B). There appears to be no dispute that the money in question was the proceeds from Ways' shops; for the reasons discussed above, we conclude that there was sufficient evidence for a jury to conclude that Ways knew that the transactions involved the proceeds of unlawful activity.

To prove that the transactions were designed to conceal the nature, source, ownership, or control of the money, the government relied on the theory that the proceeds from Ways' shops were partially the proceeds of lawful activity (attributable

_____

[8]There was evidence that Ways told his probation officer that the substances were not intended for human consumption, which could have misled him as to the legality of Ways' operations.

-11-

to the sale of legal goods), and partially the proceeds of unlawful activity (attributable to the sale of controlled substances and drug paraphernalia). See United States v. Posters N Things Ltd, 969 F.2d 652, 661 (8th Cir. 1992), aff'd 511 U.S. 513 (1994); United States v. Shoff, 151 F.3d 889, 891 (8th Cir. 1998) (discussing cases where money laundering involved commingling funds). The government introduced evidence that Ways' corporate alter ego was NKOSI, Inc., which he incorporated under the name Jon Blacksteel, an alias Ways used. Ways was the minority owner of NKOSI, and his teenage daughter was the majority owner. Ways opened bank accounts under his corporate identity, into which he deposited the proceeds from all sales at his shops, legal and illegal alike. Ways also opened and closed accounts at multiple banks, ultimately moving funds between accounts at six separate banks.

The evidence that Ways conducted the identified transactions knowing that those transactions were designed to launder the proceeds from the unlawful sales at his shops is circumstantial and limited. But Ways' conclusory assertions give us no basis to find that the jury's verdict was unreasonable. Ways makes no effort to reconcile his general denial with the evidence. For instance, he argues his bank accounts "were not concealed or disguised in any manner whatsoever." Yet the jury heard evidence that these accounts were opened and maintained under an alias rather than his true name. He also had numerous bank accounts at six different banks, and he used a corporate alter ego. This evidence showed more than mere spending of illegal funds, and more than mere commingling of funds. United States v. Vanhorn, 296 F.3d 713, 718 (8th Cir. 2002). We also note the high degree of deference to which the jury's verdict is entitled. See Posters N Things, 969 F.2d at 661. Like the Posters N Things court, "[i]f we had sat on the jury, we might not have convicted [the defendant] for money laundering." Id. But based on the evidence adduced at trial, we cannot say that no reasonable jury could have found that Ways conducted the financial transactions related to his business knowing that the transactions were at least partly designed to conceal the nature, source, ownership, or control of some of the proceeds from his shops.

Finally, as to Count 4, Ways argues there was insufficient evidence for the jury to find that he had knowingly possessed ammunition that had been transported in interstate commerce. See 18 U.S.C. § 922(g)(1). As to this count, we agree. The ammunition in question was found in a storage area in the basement of the Lincoln, Nebraska, home where Ways' daughter and girlfriend lived. Ways had given the address to his probation officer and identified the home as his daughter's residence. Items of men's clothing were found in the master bedroom. A few business records related to Ways' shops were also found in the house, and in the living room there was a cardboard box with shipping labels addressed to "Frank Foitz" at one of the Exotica stores. The ammunition was stored in a military ammunition can in the east storage room of the basement. A bong and three glass pipes were also found on the east side of the basement, though apparently not in the storage room itself. Finally, one of Ways' employees testified that Ways had told him he owned an AR-15 rifle. An ATF agent testified that he used 5.56 mm ammunition in his own AR-15 rifle, implying that 5.56mm ammunition is generally compatible with that type of firearm.

Though the evidence does establish that Ways had a connection to the residence and was present there, "mere presence [in a house where contraband is located] is not sufficient to support a conviction for possession." United States v. Jackson, 610 F.3d 1038, 1043 (8th Cir. 2010) (finding constructive possession where there was evidence that the defendant lived in the house, that he sold drugs there, and that his personal belongings were in the rooms where the agents found drugs) (quoting United States v. Boyd, 180 F.3d 967, 979 (8th Cir. 1999)). Rather, constructive possession requires both knowledge that the contraband is present and dominion over the premises where the contraband is located. United States v. McClellon, 578 F.3d 846, 854 (8th Cir. 2009). Where, as here, the defendant does not own the residence where contraband is found, "it takes more evidence of knowledge and control" to prove that the defendant possessed that contraband. United States v. Cruz, 285 F.3d 692, 697–98 (8th Cir. 2002) (finding insufficient evidence of possession where the defendant

-13-

stayed in the residence, but there was no evidence that he knew of or exercised control over the contraband found there).

We consider the sufficiency of the evidence on this count a close call, but ultimately conclude that the evidence was insufficient for a reasonable jury to find *beyond a reasonable doubt* that Ways possessed the ammunition. Cf. Jackson, 610 F.3d at 1043. Though Ways admittedly stayed in the house regularly, he did not own the house and it was not his only—or primary—residence. Ways' probation officer testified that a different address "ha[d] always been listed" as Ways' primary address, and that Ways had provided the additional address only because it was where his daughter lived. The government cites to clothing found in the master bedroom and business records found in an unspecified location in the house as evidence that Ways had a connection to the house—but a mere connection to a house is insufficient to prove constructive possession of contraband therein. See Cruz, 285 F.3d at 697–98. The shipping labels on the cardboard box in the living room also showed some connection between Ways' shops and the residence, but again, that connection does nothing to show Ways' knowledge of the ammunition in the basement. To the extent that the government relies on an assumption that the bong and glass pipes demonstrated Ways' access to and use of the basement space in general, it cites to no evidence actually tying the bong and glass pipes to Ways or to his shops. In addition, there were other items ("boxes and junk") stored in the basement, but the record shows that none of it was identified as being connected to any particular person. In fact, one of the ATF agents testified that he found nothing "relating to Mr. Ways in the east storage area of the basement." Moreover, a hearsay statement suggesting that Ways at some point possessed an AR-15 does very little to bolster a conclusion that he possessed the ammunition stored in the basement of someone else's home, without stronger and more specific evidence tying the ammunition to that particular firearm. To convict Ways of being a felon in possession of ammunition, the jury was required to find more than a suspicion that he possessed the ammunition—it was required to

-14-

find that the evidence established knowing possession beyond a reasonable doubt. The evidence in this case was insufficient to support this finding.

Accordingly, we conclude that the evidence presented was sufficient to sustain the convictions on Counts 1–3 charged in the indictment, but insufficient to sustain Count 4.

## IV. Forfeiture

Finally, Ways challenges the district court's entry of a preliminary order of forfeiture. After the jury in this case found by special verdict that the property named in the indictment was subject to forfeiture, the district court concluded that the government had established the requisite nexus between the property and the offenses of conviction. The court accordingly entered a preliminary order of forfeiture. Ways argues that the evidence adduced at trial was insufficient to support the nexus. We review the ultimate legal conclusion of whether property is subject to forfeiture de novo, and review the district court's factual findings for clear error. United States v. Beltramea, 785 F.3d 287, 290 (8th Cir. 2015).

For the property in this case to be subject to forfeiture as a result of Ways' convictions, the government was required to establish by a preponderance of the evidence that the property sought to be forfeited was obtained as a result of the offenses, was used to commit the offenses, or was otherwise traceable to the offenses. 18 U.S.C. § 982(a)(1); 21 U.S.C. § 853(a)(1) and (2); Beltramea, 785 F.3d at 290. In arguing that the government failed to adduce sufficient evidence to support this finding, Ways urges a reexamination of the trial evidence—attacking the credibility of various witnesses, among other things—but does not identify any clear error in the district court's factual findings. Ways' argument that his property was not subject to forfeiture relies on the premise that his business was entirely legal, which we have rejected for the reasons discussed above. Ways also fails to identify which specific

-15-

pieces of property should not be subject to forfeiture—failing to distinguish, for example, between the drug paraphernalia, which is illegal to possess under any circumstances, and the computer equipment. The jury found that the evidence at trial linked the money, the paraphernalia, the ammunition and gun safes,[9] the computers and computer equipment, and the two vehicles to Ways' offenses, and we cannot say that the district court's subsequent factual determination that there was the requisite nexus between the property and the offenses was clearly erroneous. Accordingly, the district court did not err in entering the preliminary order of forfeiture against Ways' property.

## V. Conclusion

For the foregoing reasons, we reverse Ways' conviction for being a felon in possession of ammunition, and affirm the judgment of the district court in all other respects.

———————————————

[9]We note, with regard to Count 4, that these safes were seized from his shops, no firearms were found inside, and there is no evidence in the record connecting the gun safes to the ammunition found in the residence.