# United States Court of Appeals
### For the Eighth Circuit

_____

No. 19-2487

_____

United States of America

*Plaintiff - Appellee*

v.

Cleophus Reed, Jr.

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: June 19, 2020
Filed: August 25, 2020

_____

Before KELLY, ERICKSON, and STRAS, Circuit Judges.

_____

KELLY, Circuit Judge.

Cleophus Reed, Jr., appeals after a jury convicted him on three counts of drug
and gun charges. He challenges the sufficiency of the evidence on all counts, the

racial composition of the jury venire, and the length of his sentence. Finding no basis for reversal, we affirm the district court's[1] judgment.

## I.

Sergeant Adam Lepinski of the Minneapolis Police Department began investigating a suspected drug-trafficking organization in the spring of 2017. During this investigation, law enforcement executed a search warrant at a house on Colfax Avenue in Minneapolis. No one appeared to reside at the house, but officers found evidence of drug trafficking: respirator masks, latex gloves, scales, packing material, a blender used to grind and cut heroin with other substances, two hydraulic presses for making bricks of heroin, and 300 grams of heroin inside a large travel mug. Officers also found 839 grams of heroin, 751 grams of crack cocaine, and a 9 mm semi-automatic handgun in the trunk of a car parked in the driveway.

Law enforcement later obtained a warrant to search an apartment on Emerson Avenue in Minneapolis, where they believed Reed lived. No one was home when officers executed the search warrant, but they found evidence that Reed lived there, including photographs of his wife, Vivian; men's clothing; and mail, tax documents, and casino rewards cards bearing his name. Officers also found a handwritten note claiming responsibility for everything in the apartment:

> I Cleophus Reed Jr.
> [date of birth] am responsible for
> all activities in [street number] emerson Ave N 19
> To whomever it may
> concern with all knowledge
> Vivian M. Reed, has know [sic]
> knowledge of anything.

[1]The Honorable Nancy E. Brasel, United States District Judge for the District of Minnesota.

Officers discovered evidence of drug trafficking at the Emerson apartment: the same brand of respirator masks, hydraulic press, latex gloves, and travel mug as found at the Colfax house. They also found two guns in an unlocked box on the bedroom floor: a Ruger .40 caliber semi-automatic pistol with a scratched-off serial number and a Taurus .22 caliber semi-automatic pistol with a distinctive tip-up barrel.

After searching the Emerson apartment, law enforcement obtained a warrant to collect Reed's DNA. Lepinski went to the apartment to execute this warrant on July 25, 2017. He could hear someone inside, but no one answered the door. Lepinski testified that he believed Reed was inside the apartment based on text messages later recovered from Reed's phone. One message sent from Reed's phone on that date read: "Police just came by. Stay away from here." Another message sent to Reed's wife read: "Police just left saying call him. Lepenski [sic]."

The next day, Lepinski stopped Reed while he was driving his van. Lepinski's microphone recorded the traffic stop, and the government played the recording at trial. During the stop, Reed told Lepinski, "Let uh, the bird know . . . he'll be decapitated before the Super Bowl." A subsequent search of Reed's van uncovered the same brand of latex gloves found at both the Colfax house and the Emerson apartment. Additionally, text messages on Reed's phone indicated he was involved in drug trafficking. One sender wrote, "I need an oz of fast." Reed replied, "On Rez."

In September 2017, the grand jury returned a six-count indictment charging Reed, David Kline, Timothy Dulaney, and Manley Humphries with drug and firearms offenses. Reed was charged in Count One with conspiracy to distribute heroin, powder cocaine, and crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. He was charged in Count Two with possession with intent to distribute heroin and crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), and 18 U.S.C. § 2. And he was charged in Count Five with possessing firearms as a convicted felon,

in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Special Agent Bryan Lervoog transported Reed to court to make an initial appearance. Lervoog testified that during the trip, Reed volunteered, without prompting, "The CRI is going to have a bad time."[2]

Reed was the only co-defendant to proceed to trial. During jury selection, he objected to the racial composition of the jury venire as overwhelmingly white. Reed argued the venire did not represent a fair cross-section of the community. The district court provisionally overruled the objection after finding no evidence to establish that the venire was unrepresentative of the community, or that any under-representation was due to a systematic exclusion of any group from the jury pool.

At trial, the government alleged Reed conspired with his co-defendants and others to distribute heroin and cocaine from the Colfax house. The government contended that Dulaney rented the Colfax house and allowed Kline to use it as a stash house. Reed's alleged role in the conspiracy was to prepare heroin for distribution by cutting it with other substances and pressing it into blocks. He also cooked powder cocaine into crack cocaine and would occasionally sell the drugs. The government alleged that while Reed prepared the drugs, he wore a respirator mask and latex gloves to protect himself. A forensic analyst from the Minnesota Bureau of Criminal Apprehension testified that one of the respirator masks from the Colfax house tested positive for Reed's DNA.

Several of Reed's alleged co-conspirators testified for the government at trial. Jevone Gentle acknowledged that he sought "a break on his sentence" by testifying. He implicated Reed in the conspiracy, explaining that Reed would bring heroin and cocaine to the Colfax house and would "cook" the drugs while using the hydraulic

---

[2]The government alleged that "CRI" is a common abbreviation for "confidential reliable informant."

presses and respirator masks. Gentle saw Reed put drugs in the trunk of the car parked in the driveway. He also saw Reed with guns on numerous occasions but was unable to provide specific dates.

Dulaney also testified. He had pleaded guilty to the drug-trafficking conspiracy and acknowledged that he also was testifying in hopes of receiving a reduced sentence. He explained that Reed's role was to prepare the drugs and to sometimes sell them. Dulaney said Reed had access to the drugs stored in the car parked at the Colfax house. He also testified that Reed possessed firearms. Kenneth Mack, a cooperating witness, told the jury that he too agreed to testify "[w]ith the hope that [he] will get reduction in his sentence." According to Mack, Reed worked with Kline to produce and sell drugs.

Vivian Reed testified for the defense. She explained that Reed did not have access to the Emerson apartment when the police searched it. She believed law enforcement planted the guns in the apartment. On cross-examination, the government elicited testimony from Vivian about a previous search warrant executed at a home she shared with Reed in 2012, where the police recovered crack cocaine. The government argued this provided context for the handwritten note found at the Emerson apartment: she had been drawn into Reed's illegal activities before, so he wrote the note to prevent the same from happening again.

Reed also testified. He denied being involved in the charged conspiracy and challenged the government's evidence against him. Reed explained that he worked with Kline's mother and, as part of his work, used a respirator mask while cleaning. He suggested this was how a respirator mask with his DNA turned up at the Colfax house. He denied any knowledge of the guns found at the Emerson apartment.

After a three-day trial, the jury convicted Reed on all three counts. Reed then moved for a new trial under Federal Rule of Criminal Procedure 33, based on the

racial composition of the jury venire. The district court denied the motion. At sentencing, the court calculated an offense level of 34 and a criminal history category V, resulting in a Guidelines range of 235 to 293 months in prison. Reed objected to how the Guidelines' drug conversion tables treat crack cocaine significantly more harshly than powder cocaine, and urged the district court to disregard the Guidelines for this reason. The court acknowledged its authority to disagree with the Guidelines for policy reasons but declined to do so. The court imposed a 240-month sentence on Counts One and Two and a concurrent 120-month sentence on Count Five. Reed timely appealed.

## II.

Reed first challenges the sufficiency of the evidence against him on all three counts. He argues the three cooperating witnesses only testified against him to receive reduced sentences in their own criminal cases. He notes that Gentle was unable to provide much detail about when Reed participated in the drug conspiracy or possessed firearms. He also points out that Lepinski testified that he never saw Reed with his co-defendants or at any of the properties Lepinski surveilled.

We review the sufficiency of the evidence de novo, evaluating the evidence in the light most favorable to the verdict and drawing all reasonable inferences in its favor. United States v. Parker, 871 F.3d 590, 600 (8th Cir. 2017). We will reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. United States v. Ways, 832 F.3d 887, 894 (8th Cir. 2016).

## A.

To prove Reed guilty of Count One, the government had to establish that: (1) two or more people reached an agreement to distribute heroin, powder cocaine, or crack cocaine; (2) Reed voluntarily and intentionally joined that agreement; and

(3) at the time Reed joined the agreement, he knew its essential purpose. See 21 U.S.C. §§ 841(a)(1), 846; United States v. Meeks, 639 F.3d 522, 527 (8th Cir. 2011). Proof of an express agreement is not necessary, and the government may rely on circumstantial evidence to establish an agreement. Meeks, 639 F.3d at 527. To prove Reed guilty of Count Two, the government had to establish that Reed knowingly possessed a controlled substance and that he intended to distribute the drugs to another person. See 21 U.S.C. § 841(a)(1); United States v. Morales, 813 F.3d 1058, 1065 (8th Cir. 2016).

The government presented sufficient evidence to support Reed's convictions on Counts One and Two. Multiple witnesses consistently identified Reed as a member of the drug conspiracy operating out of the Colfax house. These witnesses testified that Reed was a "cook" who would turn powder cocaine into crack cocaine and mix, cut, and press heroin with hydraulic presses while wearing latex gloves and respirator masks. Reed's DNA was found on a respirator mask in the Colfax house. While Reed explained that his DNA was on the mask because he worked as a cleaner for Kline's mother, the jury was not obligated to credit this testimony over the testimony of the other witnesses. See, e.g., United States v. King, 898 F.3d 797, 808 (8th Cir. 2018) (explaining that a jury may base its verdict on the testimony of cooperating witnesses). In the kitchen of the Colfax house, a large travel mug held 300 grams of heroin. Law enforcement also found large quantities of heroin and crack cocaine and a handgun in a car parked in the driveway. One of the government's witnesses testified that he saw Reed place drugs in the car's trunk. Evidence showed that Reed also occasionally sold the drugs he prepared. Witnesses attested to this fact, and text messages from Reed's phone corroborated their testimony.

Moreover, evidence at the Emerson apartment connected Reed to the drug-trafficking operation at the Colfax house. At the apartment, police found the same type of hydraulic press, respirator mask, latex gloves, and travel mug found at the

Colfax house. Police also discovered tax documents, casino cards, and mail bearing Reed's name, as well as men's clothing and photographs of Reed's wife. A handwritten note, apparently from Reed, claimed responsibility for everything in the apartment. Lepinski's testimony supported the conclusion that Reed was at the apartment when Lepinski tried to execute the DNA warrant. And a subsequent search of Reed's van uncovered the same brand of latex gloves found in both the Colfax house and the Emerson apartment.

The government also introduced evidence that Reed had threatened cooperating witnesses in the presence of law enforcement on two occasions. We have said that a threat against a potential informant is evidence that may show knowledge of and participation in a conspiracy. United States v. Nunn, 940 F.2d 1128, 1131 (8th Cir. 1991). And while Reed strongly denied his guilt at trial, the jury was not obligated to believe him. See United States v. Never Misses A Shot, 781 F.3d 1017, 1026 (8th Cir. 2015).

Finally, Reed argues that the cooperating witnesses were simply not credible because they testified to reduce their own prison sentences. But the jury heard this argument from Reed's attorney during his closing remarks, and the district court instructed the jury to consider the witnesses' motivations when assessing their testimony. The jury is "capable of evaluating the credibility of testimony given in light of the agreements each witness received from the government." United States v. Tillman, 765 F.3d 831, 834 (8th Cir. 2014) (quoting United States v. Conway, 754 F.3d 580, 587 (8th Cir. 2014)). "The jury is the final arbiter of the witnesses' credibility, and we will not disturb that assessment" on appeal. United States v. Listman, 636 F.3d 425, 430 (8th Cir. 2011) (quoting United States v. Hayes, 391 F.3d 958, 961 (8th Cir. 2004)). The evidence was sufficient to support the jury's verdicts on Counts One and Two.

**B.**

Reed also challenges his conviction for possessing firearms as a felon. See 18 U.S.C. § 922(g)(1). This conviction was based on the Ruger .40 caliber semi-automatic pistol and Taurus .22 caliber semi-automatic pistol found inside the Emerson apartment. Reed stipulated at trial that he was a convicted felon during the relevant time; on appeal, he argues only that the government failed to show that he possessed these firearms.

We conclude the evidence was sufficient to support the jury's verdict. As discussed above, numerous pieces of evidence connected Reed to the Emerson apartment where the guns were found. Gentle and Dulaney testified that they saw Reed with the two guns in question. They identified the guns by their distinctive features: the Ruger had a scratched-off serial number and the Taurus had a tip-up barrel, which a firearms technician explained was made by only a couple of gun manufacturers. Based on this evidence, a jury reasonably could find Reed possessed the guns as the government alleged.

**III.**

Reed next argues that the district court erred by denying his motion for a new trial. In his motion, Reed reasserted that the jury venire did not represent a fair racial cross-section of the community. In response, the district court found that the District of Minnesota "primarily relies on voter registration lists to select jurors randomly, and supplements the list with driver's license lists; state identification card holder lists; and other similar lists to be used by order of the court, including, but not limited to, tribal member lists." The court also found that jurors called for trial in the District's Third Division (St. Paul courthouse) and those called for trial in the Fourth Division (Minneapolis courthouse) "are drawn from the same pool." The court ultimately

-9-

decided that Reed failed to show that the representation of Black people on the venire was unfair or unreasonable in relation to the number of Black people in the community or that any under-representation was due to systematic exclusion.

Generally, we will reverse the district court's ruling on a Rule 33 motion "only if we find that ruling to be a clear and manifest abuse of discretion." United States v. Amaya, 731 F.3d 761, 764 (8th Cir. 2013) (quoting United States v. Malloy, 614 F.3d 852, 862 (8th Cir. 2010)). But where, as here, a defendant claims that jury selection violated his Sixth Amendment right to a fair cross-section of the community, we review the district court's decision de novo. United States v. Sanchez, 156 F.3d 875, 879 (8th Cir. 1998); see also United States v. Rodriguez, 581 F.3d 775, 789 (8th Cir. 2009) ("Allegations of racial discrimination in jury pools involve mixed questions of law and fact, and receive de novo review.").

The Sixth Amendment entitles a defendant to an "impartial jury drawn from a fair cross-section of the community." Taylor v. Louisiana, 419 U.S. 522, 536 (1975). To establish a prima facie Sixth Amendment violation based on the composition of the jury venire, a defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process.

Duren v. Missouri, 439 U.S. 357, 364 (1979).

There is no dispute that Black people are a "distinctive" group for purposes of the Duren test. United States v. Womack, 985 F.2d 395, 397 (8th Cir. 1993). To satisfy the second part of the Duren test, Reed must first "demonstrate the percentage

of the community made up of the group alleged to be underrepresented." Duren, 439 U.S. at 364.  This number is "the conceptual benchmark for the Sixth Amendment fair-cross-section requirement."  Id.  Then, Reed must show that the representation of this group in the pool of potential jurors is not fair or reasonable in relation to the percentage of this group in the community.  Id.  A "gross discrepancy" between the percentage of members from the distinctive group in jury venires and the percentage of the distinctive group in the community will satisfy the second part of the Duren test.  Id. at 366.

Reed's claim fails to establish the second part of the Duren test.  He did not provide evidence of the racial composition of the jury pool used by the District of Minnesota, or even the composition of the potential jurors called for his trial.  Instead, he simply provided the percentage of Minnesota residents as a whole who are Black (6.5%) and argued "there is a perception of racial disparity in voting in Minnesota."  At oral argument, the government suggested that Reed could have obtained information about the racial composition of the District's jury pool through a Rule 17 subpoena, see Fed. R. Crim. P. 17, but he did not do so.  In short, Reed did not present the district court with the relevant statistics to support his motion, and thus failed to show that Black people are under-represented in the District's pool of potential jurors.[3]

---

[3]Reed's argument also overlooks the fact that the District does not draw its list of potential jurors solely from the state's voter rolls.  Rather, the District supplements its list with "driver's license lists; state identification card holder lists; and other similar lists to be used by order of the court, including, but not limited to, tribal member lists."  Therefore, even accepting Reed's claim that there is a racial disparity in the state's list of *voters*, he has not demonstrated any racial disparity in the District's list of potential jurors.  See Duren, 439 U.S. at 364; Sanchez, 156 F.3d at 879.

**IV.**

Reed also challenges the length of his sentence. We review Reed's challenge by first ensuring "that the district court committed no significant procedural error." See United States v. Clayton, 828 F.3d 654, 657 (8th Cir. 2016) (quoting Gall v. United States, 552 U.S. 38, 51 (2007)). We then "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." Id. (quoting Gall, 522 U.S. at 51). "A district court abuses its discretion when it fails to consider a relevant factor, gives significant weight to an irrelevant or improper factor, or considers only appropriate factors but nevertheless commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case." Id. (quoting United States v. San-Miguel, 634 F.3d 471, 475 (8th Cir. 2011)).

Reed argues the district court improperly relied on the Guidelines' drug conversion tables to calculate his offense level. See U.S. Sent'g Guidelines Manual § 2D1.1, cmt. n.8 (U.S. Sent'g Comm'n 2018). Reed asserts that the tables establish an unreasonably high conversion rate for crack cocaine. They equate one gram of crack cocaine to 3,571 grams of converted drug weight. Id. By contrast, the tables equate one gram of powder cocaine to just 200 grams of converted drug weight. Id. Reed suggests this discrepancy affects Black defendants "at a higher rate."[4]

Sentencing courts are "entitled to reject and vary categorically from the crack cocaine Guidelines based on a policy disagreement with those Guidelines." Spears v. United States, 555 U.S. 261, 265–66 (2009). But "while a district court may choose to deviate from the guidelines because of a policy disagreement, it is not

---

[4]Reed did not offer evidence to the district court to support this claim, and he does not challenge the Guidelines' drug conversion tables under the Equal Protection Clause of the Fourteenth Amendment.

required to do so." United States v. Heim, 941 F.3d 338, 340 (8th Cir. 2019) (cleaned up). "In recent years, numerous defendants have argued on appeal that a district court erred when it refused to vary from a guidelines provision for policy reasons," and we have rejected those challenges. Id.

Reed argued at sentencing that the district court should disregard the Guidelines' drug conversion tables because of their unreasonably harsh treatment of crack cocaine. The court expressly recognized its authority to vary based on a disagreement with the crack cocaine conversion rate but declined to do so. The district court did not err. See United States v. Anderson, 618 F.3d 873, 884 (8th Cir. 2010) ("The district court . . . was aware of its discretion to consider a variance based on the crack/powder disparity and did not abuse its discretion in deciding not to exercise such discretion to grant Anderson's requested variance.").

To the extent Reed argues his sentence is otherwise substantively unreasonable, we disagree. His 240-month sentence is within the Guidelines range of 235 to 293 months, and he has not shown that the district court improperly weighed the sentencing factors. See Clayton, 828 F.3d at 657–58. The court considered Reed's criminal history and the "very significant" offenses for which he was found guilty at trial. It also considered the disparity between his sentence and those of his co-defendants. These are appropriate factors to consider when making a sentencing decision, and the record does not show that the court overlooked any relevant factor. See United States v. Hall, 825 F.3d 373, 375 (8th Cir. 2016).[5]

---

[5]Reed mentions a few additional concerns in his opening brief, but he does not meaningfully develop or argue them. Because he provides no basis in law or fact for his cursory assertions of error, we cannot consider the merits of these claims. See United States v. Mshihiri, 816 F.3d 997, 1009 n.5 (8th Cir. 2016); see also United States v. Welch, 811 F.3d 275, 278 n.2 (8th Cir. 2016) ("At no point does [Welch] cite authority, cite to the record, or provide reasoning in support of this argument."); United States v. Warren, 788 F.3d 805, 814–15 (8th Cir. 2015) ("Since Warren has

We affirm the district court's judgment.

_____

---

failed to go beyond a cursory assertion of this argument in his opening brief and made no mention of it in his reply brief or at oral argument, we refuse to consider the merits of the issue.").