# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-2122
_____

United States of America

*Plaintiff - Appellee*

v.

Jerome C. Ruzicka

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: October 23, 2020
Filed: February 16, 2021
_____

Before SMITH, Chief Judge, LOKEN and GRUENDER, Circuit Judges.
_____

GRUENDER, Circuit Judge.

A jury found Jerome C. Ruzicka guilty on four counts of mail fraud, three counts of wire fraud, and one count of tax fraud. *See* 18 U.S.C. §§ 1341, 1343; 26 U.S.C. § 7206(1). The district court[1] denied Ruzicka's motions for judgment of

---

[1]The Honorable John R. Tunheim, Chief Judge, United States District Court for the District of Minnesota.

acquittal and for a new trial. Ruzicka appeals, raising *Napue*, *Brady*, Jencks Act, and sufficiency-of-the-evidence challenges to his convictions and disputing the district court's fraud-loss calculation for purposes of sentencing and restitution. We affirm.

## I.

Ruzicka was president of Starkey Laboratories, a corporation that sells hearing aids. In 2006, Ruzicka and fellow Starkey executive Scott Nelson formed Northland Hearing Centers, Inc., to handle Starkey's acquisitions of hearing-aid retail businesses. Starkey received 49 percent ownership of Northland, with the remaining 51 percent divided among Ruzicka, Nelson, and a third Starkey executive named Jeffrey Longtain. Under a "Restricted Stock Agreement," Ruzicka's, Nelson's, and Longtain's stock would not vest until 2016. This date coincided with the termination of Ruzicka's employment agreement with Starkey and with Ruzicka's planned retirement date. If Ruzicka left or was fired by Starkey before 2016, then he would forfeit his share. The same was true of Nelson and Longtain.

The Restricted Stock Agreement was in tension with Northland's "Shareholder Agreement," which provided for a 90 percent equity payout upon an employee's voluntary departure and a 75 percent equity payout upon an employee's involuntary departure. Michael Grimes, the lawyer who drafted both documents, testified at trial that although "experts and lawyers in good faith could disagree about the[ir] interaction," his understanding was that "the restricted stock agreement controls."

In 2013, Ruzicka, Nelson, and Longtain began to cause Starkey, through Northland, to pay them a total of $15,528,724.95 to buy out their stock early and cover their estimated tax liability on the transactions. Nelson was allegedly using the money to finance a condominium to carry on an affair. Although there were tax advantages to recording the transactions on Starkey's books, Nelson added Ruzicka and himself to Northland's payroll for one week so that they could record the

transactions on Northland's books instead (Longtain was already on Northland's payroll). This kept the transactions hidden from Starkey's chief executive officer, William Austin. Later, when Austin requested a report related to Northland, Ruzicka instructed Nelson to delete the stock buyouts from the report.

Although Ruzicka, Nelson, and Longtain had arranged for Northland to cover their estimated tax liability for the buyouts, their tax liability turned out to be higher than estimated. So, they caused Starkey to transfer them additional funds to cover the balance, attaching promissory notes to at least some of the transfers so that they could claim that the transfers constituted loans rather than taxable income. Despite the characterization of the transfers as "loans," Longtain testified at trial that his understanding was that he was never "going to have to pay [his loan] back." Ruzicka, Nelson, and Longtain recorded the transfers as life-insurance expenses to prevent them from appearing on Starkey's and Northland's payroll reports.

Separately, Ruzicka embarked on two ventures with Jeff Taylor, vice president of sales at Sonion, a supplier of hearing-aid components. Ruzicka and Taylor co-owned a pair of entities called "Archer Acoustics" and "Archer Consulting." By misrepresenting to Sonion that Archer Acoustics was a Starkey affiliate, Taylor secured a discount from Sonion on hearing-aid components, which Ruzicka and Taylor resold for a profit. Meanwhile, Ruzicka approved payments from Starkey to Archer Consulting for sham services. He and Taylor then distributed the payments to themselves by various means, including by check through the mail.

Following an investigation, Ruzicka was fired in 2015 and indicted in September 2016 along with Nelson, Taylor, and two other defendants (Longtain was charged separately). The details of the indictment, including Nelson's affair, made the news the same month. In March 2017, the Government conducted a reverse proffer[2] with Nelson during which it referred to his affair while summarizing the

_____

[2]A "reverse proffer" occurs when "the prosecutors describe[] the evidence against the defendant so that he c[an] make an informed decision whether to plead guilty or proceed to trial." *United States v. Doe*, 537 F.3d 204, 207 (2d Cir. 2008).

evidence against him. Nine months later, Nelson pleaded guilty. It appears that the Government neither disclosed the occurrence of the reverse proffer to Ruzicka nor provided him with a report authored by FBI Agent Brian Kinney that memorialized the meeting but contained no statements made by Nelson. Both Nelson and Agent Kinney testified against Ruzicka at trial.

At trial, the defendants accused the Government of violating *Napue v. Illinois*, 360 U.S. 264 (1959), by knowingly submitting perjured testimony to the jury. In a midtrial, written order ("*Napue* Order"), the district court agreed with the defendants on two of their accusations. The first involved Austin's statement that he did not shred certain documents; the second involved Austin's testimony that he believed that Ruzicka had drafted a certain contract in a single day. The district court found that both statements were false and that the Government should have known they were false because they conflicted with the testimony of other Government witnesses. Ordered by the district court to correct the allegedly false testimony, the Government recalled its other witnesses and had them confirm that Austin's testimony conflicted with theirs. The district court then ordered Austin's statements stricken from the record and concluded that, by correcting the allegedly false testimony, the Government had avoided violating *Napue*.

After trial, the district court agreed with the defendants regarding a third *Napue* allegation. The Government had presented evidence that, in 2010, Ruzicka caused Starkey to purchase a company called "SoundPoint Audiology," in which Ruzicka possessed a 27 percent ownership stake, for $850,000. Earlier, however, IRS Agent and Government witness Shannon Korpela had claimed that Starkey had paid $850,000 not for SoundPoint in its entirety but only for SoundPoint's accounts receivable. According to the district court, Agent Korpela's testimony on this point was so "blatantly wrong" that the Government should have known it was false. Nonetheless, the district court concluded that the *Napue* violation was harmless because Agent Korpela's false testimony was not relevant to any count of conviction.

The jury convicted Ruzicka on eight of twenty-five counts, including two counts of mail fraud (Counts 2 and 3) and one count of wire fraud (Count 10) relating to Northland, one count of mail fraud relating to Archer Consulting (Count 4), and two counts of wire fraud relating to Archer Acoustics (Counts 7 and 19). At sentencing, both for the purposes of calculating Ruzicka's offense level under the advisory sentencing guidelines and for the purposes of restitution, the district court treated the entire $15,528,724.95 that Ruzicka, Nelson, and Longtain had caused Starkey to pay them to buy their Northland stock and cover their estimated tax liability as part of Starkey's loss. The district court sentenced Ruzicka to 84 months' imprisonment, imposed a fine of $10,000, and issued a restitution order that included the $15,528,724.95 that Ruzicka, Nelson, and Longtain received in the Northland stock transactions. The district court denied Ruzicka's motions for a new trial as well as his renewed motion for judgment of acquittal.

Ruzicka appeals. He argues that *Napue*, *Brady*, and Jencks Act violations, either individually or cumulatively, entitle him to a new trial; that insufficient evidence in support of Counts 2, 3, 4, 7, 10, and 19 entitles him to acquittal or a new trial on those counts; and that an error in the district court's fraud-loss calculation requires vacatur of his sentence and the district court's restitution order.

## II.

We begin with Ruzicka's *Napue* claims. Under *Napue*, the "failure of the prosecutor to correct the testimony of [a] witness which he knew to be false," *Napue*, 360 U.S. at 265, or "should have known" to be false, *United States v. Martin*, 59 F.3d 767, 770 (8th Cir. 1995), constitutes a denial of a defendant's constitutional right to due process, *see Napue*, 360 U.S. at 265. A *Napue* violation requires a new trial on any count of conviction on which the violation could "in any reasonable likelihood have affected the judgment of the jury." *Id.* at 271. When evaluating a due process claim such as a *Napue* claim, "we review the district court's findings of fact for clear error, but we review de novo whether those facts establish a due process

defect." *United States v. Santos-Pulido*, 815 F.3d 443, 445 (8th Cir. 2016) (internal quotation marks and brackets omitted).

Ruzicka alleges numerous *Napue* violations. First, he points to the two statements made by Austin that the district court identified as potential *Napue* violations in its *Napue* Order. The district court agreed that these statements were false and that the Government should have known they were false. But it concluded that the Government avoided any constitutional violation by correcting the false testimony.

Even assuming both statements were false and the Government should have known they were false, the district court correctly concluded that neither gave rise to a *Napue* violation because neither went uncorrected. A *Napue* violation requires not only false testimony by a Government witness but also the "failure of the [Government] to correct [this] testimony." *Napue*, 360 U.S. at 265; *accord United States v. Johnson*, 649 F.2d 617, 618 (8th Cir. 1981) (explaining that a *Napue* violation occurs only "when the prosecutor . . . allows [false testimony] to stand uncorrected"). Here, the Government recalled the two witnesses whose testimony conflicted with Austin's, asked them if Austin's testimony was consistent with theirs, and elicited from each the response that it was not. At that point, the district court "order[ed] stricken from the record" Austin's allegedly false testimony. It then concluded that "the potential constitutional violation identified in [its] *Napue* Order" had been avoided because "the Government ha[d] complied with its obligation to correct false testimony." We agree. Even assuming it was false, Austin's testimony did not cause a *Napue* violation because the Government corrected it.

Next, Ruzicka argues that Agent Korpela's testimony that Ruzicka caused Starkey to pay $850,000 for SoundPoint's accounts receivable alone gave rise to a *Napue* violation. According to the district court, the Government "failed to correct or clarify [Agent Korpela's] testimony" despite the fact that it was so "blatantly wrong" that the Government should have known it was false. The district court concluded that Agent Korpela's testimony caused a *Napue* violation, but it found

-6-

that the error was harmless because the testimony was not relevant to any count of conviction.

The district court was correct. Agent Korpela's claim that SoundPoint's accounts receivable constituted the entire consideration for Starkey's $850,000 payment was not relevant to any of the charges against Ruzicka. Indeed, there were only two counts to which the jury conceivably could have misunderstood Agent Korpela's claim to be relevant. The first was Count 1, which alleged that Ruzicka conspired to commit fraud in other matters (at trial, Agent Korpela erroneously stated that the conspiracy charged in Count 1 extended to the SoundPoint fraud). The second was Count 24, which alleged that Ruzicka committed tax fraud (at trial, the Government attempted to prove Ruzicka guilty on Count 24 by showing that he underreported the share of the $850,000 that he received as a 27 percent stakeholder in SoundPoint). As the district court pointed out, however, the jury acquitted Ruzicka on Counts 1 and 24. Therefore, any *Napue* violation associated with Agent Korpela's testimony does not require a new trial on any of the counts on which Ruzicka was convicted because there is no "reasonable likelihood that it affected the judgment of the jury" on any of those counts. *See Napue*, 360 U.S. at 271.

Finally, Ruzicka refers in passing to additional alleged *Napue* violations in connection with Austin's testimony. These passing references do not provide us with a basis to remand for a new trial. Even assuming the additional statements that Ruzicka identifies were false, Ruzicka offers no meaningful argument that the Government knew or should have known they were false and that they "could in any reasonable likelihood have affected the judgment of the jury." *See id.* We do not consider claims that a party fails "meaningfully [to] develop or argue" on appeal. *United States v. Reed*, 972 F.3d 946, 955 n.5 (8th Cir. 2020); *cf. Martin*, 59 F.3d at 770 (indicating that the defendant bears the burden of showing his entitlement to a new trial under *Napue*).

**III.**

Next, Ruzicka argues that the Government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose the reverse proffer that it conducted with Nelson. "This court reviews a district court's denial of a *Brady* motion for a new trial for abuse of discretion." *United States v. Vieth*, 397 F.3d 615, 618 (8th Cir. 2005).

A *Brady* violation occurs when the government fails to disclose "all material evidence, whether impeachment or exculpatory, in its possession that is favorable to the defendant." *United States v. Quintanilla*, 25 F.3d 694, 698 (8th Cir. 1994) (internal citation omitted). "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Id.* (internal quotation marks omitted). The nondisclosure of cumulative evidence is insufficient to undermine confidence in the outcome of a trial. *Id.* at 699.

Here, the district court correctly concluded that the Government's failure to inform Ruzicka of the reverse proffer did not constitute a *Brady* violation because the undisclosed evidence, even if favorable to Ruzicka, was not material. Ruzicka argues that the fact that the Government referenced Nelson's affair during the reverse proffer would have undermined Nelson's credibility by showing that Nelson felt pressure to cooperate with the Government to avoid embarrassing publicity. But Nelson's affair had already been revealed in the indictment and reported in the news months before the reverse proffer occurred. It is doubtful that Nelson would have felt pressure to prevent the already-public affair from going public. The fact that Nelson did not plead guilty until nine months after the meeting bolsters this conclusion. Furthermore, even if Nelson felt pressure to prevent additional details from coming to light at trial, the indictment itself was sufficient to trigger this pressure. Thus, the fact that the Government referred to the affair during the reverse proffer does not provide any reason to question Nelson's credibility beyond

-8-

whatever reason the indictment already provided. Evidence of the reverse proffer was therefore cumulative and, as such, immaterial for *Brady* purposes. *See Quintanilla*, 25 F.3d at 699. Consequently, the district court did not abuse its discretion in denying Ruzicka's *Brady* motion for a new trial.

## IV.

Ruzicka also maintains that the Government violated the Jencks Act, 18 U.S.C. § 3500, by failing to provide the defense with Agent Kinney's report memorializing the reverse proffer. Under the Jencks Act, the Government must disclose to the defense statements made by Government witnesses that "relate to the subject matter of [their] testimony." *Id.* § 3500(b). The district court concluded that the Government did not violate the Jencks Act by failing to disclose Agent Kinney's report because the report included no statements made by Government witnesses that related to the subject matter of their testimony. Ruzicka concedes that we review this finding for clear error. *See United States v. New*, 491 F.3d 369, 376 (8th Cir. 2007) ("We review a district court's ruling under the Jencks Act for clear error.").

Ruzicka fails to show that the district court committed clear error. He does not claim that the report included the statements of any Government witness other than Agent Kinney himself. But the report did not relate to the subject matter of Agent Kinney's testimony. The report merely memorialized the reverse proffer, and Agent Kinney did not testify about the reverse proffer. Therefore, Ruzicka fails to show that the district court clearly erred by finding that the report included no statements made by Government witnesses that related to the subject matter of their testimony. And if the report included no statements made by Government witnesses that related to the subject matter of their testimony, then the Government did not violate the Jencks Act by failing to disclose the report.

# V.

Next, Ruzicka claims that he is entitled to a judgment of acquittal or, in the alternative, a new trial due to insufficient evidence on Counts 2, 3, 4, 7, 10, and 19. He presents one argument that applies to Counts 2, 3, 4, and 10; a second argument that applies to Counts 7 and 19; and a third argument that applies to Count 4. Ruzicka made the first and third arguments before the district court in motions for acquittal and for a new trial; the second he makes for the first time on appeal.

A defendant is entitled to a judgment of acquittal due to insufficient evidence only if no reasonable jury could find him guilty beyond a reasonable doubt. *United States v. Trotter*, 721 F.3d 501, 504 (8th Cir. 2013). A defendant is entitled to a new trial due to insufficient evidence only if "the evidence preponderates heavily against the verdict," such that "a miscarriage of justice will occur" unless the defendant receives a new trial. *United States v. Stacks*, 821 F.3d 1038, 1045 (8th Cir. 2016). Although the district court may undertake its own evaluation of the credibility of witnesses when deciding a motion for a new trial, it must "consider all evidence in the light most favorable to the guilty verdict" when deciding a motion for acquittal. *United States v. Hilliard*, 392 F.3d 981, 987 (8th Cir. 2004).

Normally, we review the denial of a motion for acquittal due to insufficient evidence *de novo*, *Trotter*, 721 F.3d at 504, and the denial of a motion for a new trial due to insufficient evidence for abuse of discretion, *Stacks*, 821 F.3d at 1044. But if the defendant forfeited an argument by failing to make it in a motion for acquittal or a motion for a new trial, then we review the district court's failure to grant *sua sponte* a judgment of acquittal or a new trial for plain error. *See United States v. Calhoun*, 721 F.3d 596, 600 (8th Cir. 2013); *United States v. Martinson*, 419 F.3d 749, 752 (8th Cir. 2005).

A.

Ruzicka's first argument is that Austin's testimony was not credible, and without Austin's testimony there was insufficient evidence to support his convictions for mail and wire fraud in connection with Northland (Counts 2, 3, and 10) and mail fraud in connection with Archer Consulting (Count 4). Specifically, Ruzicka argues that without Austin's testimony there was insufficient evidence that Ruzicka concealed his allegedly fraudulent conduct involving these entities from Starkey.

The district court correctly denied Ruzicka's motion for a judgment of acquittal on these grounds because the district court may not undertake its own evaluation of witness credibility when deciding a motion for acquittal. *See Hilliard*, 392 F.3d at 987. And the district court did not abuse its discretion in denying Ruzicka's motion for a new trial on these grounds because there was ample evidence, even without Austin's testimony, that Ruzicka concealed his conduct from Starkey. Witnesses other than Austin testified that Ruzicka and Nelson were actively concealing the Northland stock buyouts from Starkey. For example, Nelson testified that Ruzicka directed him to remove the transactions from a report that Austin would review. In addition, witnesses other than Austin testified that Ruzicka approved payments from Starkey to Archer Consulting for sham services. It is true, as Ruzicka notes, that Nelson testified that Austin knew of the existence of Archer Consulting. But Nelson also testified that Ruzicka did not disclose to Starkey either his ownership stake in Archer Consulting or the payments that he approved from Starkey to Archer Consulting for sham services. In sum, even assuming Austin's testimony was incredible, it is not the case that "the evidence preponderate[d] heavily against" the conclusion that Ruzicka committed fraud by concealing the Northland stock buyouts and sham Archer Consulting payments from Starkey. *See Stacks*, 419 F.3d at 1045.

-11-

B.

Ruzicka's second argument is that Ruzicka and Taylor's misrepresentation to Sonion that Archer Acoustics qualified for a discount as a Starkey affiliate cannot support a conviction for wire fraud as alleged in Counts 7 and 19 because extracting a discount by misrepresentation does not constitute depriving the seller of money or property.[3] Because Ruzicka makes this argument for the first time on appeal, our review is for plain error. *See Calhoun*, 721 F.3d at 600; *Martinson*, 419 F.3d at 752. "To obtain relief under a plain-error standard of review, the party seeking relief must show that there was an error" that "is clear or obvious under current law," that "affected the party's substantial rights," and that "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Poitra*, 648 F.3d at 887.

Ruzicka fails to show that the district court erred, let alone that the district court erred plainly. It is true that wire fraud involves the use of interstate wires to execute a scheme to deprive the victim of "money or property." 18 U.S.C. § 1343. Under our caselaw, however, extracting a discount by misrepresentation constitutes depriving the seller of money or property. In *United States v. Ferro*, the government alleged in its indictment that the defendants had used the mail to "defraud[] various pharmaceutical sellers into granting substantial discounts" to the defendants' pharmacy by misrepresenting that the pharmacy qualified for the discounts. 252 F.3d 964, 965-66 (8th Cir. 2001). We reversed the district court's dismissal of the indictment for failure to state an offense, concluding that if at trial the jury found the facts to be as alleged in the indictment, then the defendants could be convicted of mail fraud, *id.* at 965-68, which involves using the mail to execute a scheme to

---

[3]Ruzicka is inconsistent in his framing of this argument, characterizing it sometimes as an argument that there was insufficient evidence to convict him on Counts 7 and 19 and other times as an argument that the district court failed to instruct the jury properly on what constitutes fraud. Reframing Ruzicka's claim as a challenge to the jury instructions would affect neither the relevant standard of review, *see United States v. Poitra*, 648 F.3d 884, 887 (8th Cir. 2011) ("Where a party fails to timely object to [a jury] instruction at trial, . . . we review only for plain error."), nor the substance of our analysis.

deprive the victim of "money or property," 18 U.S.C. § 1341. If inducing a pharmaceutical seller to sell drugs at a reduced price by misrepresenting one's eligibility for a discount constitutes depriving the seller of money or property, then so does inducing a manufacturer into selling hearing-aid components at a reduced price by misrepresenting one's eligibility for a discount.

Ruzicka does not address *Ferro*. Instead, he argues that, by deceiving Sonion into a transaction that it otherwise would not have entered, he and Taylor merely deprived Sonion of the "right to control" its property. According to Ruzicka, this did not constitute depriving Sonion of property because Sonion received "the full economic benefit of its bargain." Ruzicka acknowledges that Eighth Circuit caselaw on this point is unclear. *Compare United States v. Shyres*, 898 F.2d 647, 652-53 (8th Cir. 1990) (holding that a deprivation of "the right to control" property entails a deprivation of property), *with id.* at 653 (implying that it was relevant whether the alleged victim "would have contracted the same services for less if it knew of the kickback scheme"). With no Eighth Circuit caselaw to rely on, Ruzicka cites the Second Circuit's decision in *United States v. Binday* for the proposition that there is no mail or wire fraud "where the purported victim received the full economic benefit of its bargain." *See* 804 F.3d 558, 570 (2d Cir. 2015). Ruzicka then argues that Sonion received the full economic benefit of its bargain because Archer Acoustics paid the price that Sonion quoted for the products that Sonion supplied.

For two reasons, Ruzicka would fail to demonstrate plain error even if *Ferro* did not stand in his way. First, even assuming Sonion received the full economic benefit of its bargain, Ruzicka fails to show that it is clear or obvious under Eighth Circuit law that one who receives the full economic benefit of his bargain cannot be the victim of wire fraud. The only authority that Ruzicka cites for this proposition is the Second Circuit's decision in *Binday*, along with a pair of decisions from the Eleventh and Sixth Circuits, *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016), and *United States v. Sadler*, 750 F.3d 585 (6th Cir. 2014), that he claims

-13-

follow *Binday*.[4]   Nonbinding authority alone is insufficient to make a legal proposition clear or obvious under current law. *See FDIC v. Kan. Bankers Sur. Co.*, 840 F.3d 1167, 1171 (10th Cir. 2016) (holding that "reliance on non-binding authority from" courts in other circuits is insufficient to demonstrate plain error).

Second, even if *Binday* or the decisions following it were binding on courts in the Eighth Circuit, it is doubtful—and certainly not "clear or obvious," *Poitra*, 648 F.3d at 887—that Sonion received "the full economic benefit of its bargain" in the sense in which *Binday*, 804 F.3d at 570, used that phrase. On the contrary, *Binday* indicated that a victim does not receive "the full economic benefit of its bargain" if it "could have negotiated a better deal for itself had it not been deceived." *Id.* at 570 & n.10. Here, Sonion could have negotiated a better deal for itself (if not with Archer Acoustics, then with another buyer) had it not been deceived into believing that Archer Acoustics was entitled to a discount as a Starkey affiliate. Even under *Binday*, then, it is plausible that Ruzicka and Taylor deprived Sonion of money or property, not just the "right to control" its property. *Accord United States v. Ali*, 620 F.3d 1062, 1068 (9th Cir. 2010) (explaining that the seller did not just lose the "ability to control the downstream disposition of its products, but lost revenue when the products were sold at a discount as a result of the [defendants'] fraud").

---

[4]In his reply brief, Ruzicka discusses the Supreme Court's decision in *United States v. Kelly*, 590 U.S. ---, 140 S. Ct. 1565 (2020), as well. Although binding, *Kelly* does not stand for the proposition for which Ruzicka cites *Binday*. What the Court held in *Kelly* is that temporarily realigning lanes on a bridge does not constitute depriving the bridge owner of property. *See id.* at 1573-74. Although the lane realignment did deprive the bridge owner of control over how cars moved across its property, it did not deprive the bridge owner of control over to whom it wished to sell its property, which is the kind of deprivation of control at issue here and in *Binday*, 804 F.3d at 567. The proposition that one who receives the full economic benefit of his bargain cannot be the victim of wire fraud is plainly inapplicable to a case, like *Kelly*, that involved no bargain but only "an exercise of regulatory power." *See* 140 S. Ct. at 1568.

-14-

We conclude that Ruzicka fails to show that the district court plainly erred in not *sua sponte* granting judgment of acquittal or a new trial on Counts 7 and 19.

## C.

Ruzicka's third argument is that an element of mail fraud is the use of the mail in furtherance of the fraud, and there was insufficient evidence that he used the mail in furtherance of the Archer Consulting fraud alleged in Count 4.

Ruzicka is correct that mail fraud requires the use of the mails "in furtherance of some essential step in the scheme" to defraud. *See United States v. Bennett*, 765 F.3d 887, 893 (8th Cir. 2014). A step is essential to a scheme to defraud if "the long-term success of the fraud . . . turn[s] on" whether the step is completed. *Schmuck v. United States*, 489 U.S. 705, 714 (1989). For example, "post-fraud accounting among the potential victims" generally is not an essential step in a scheme to defraud because perpetrators of fraud generally are "indifferent to the fact of who b[ears] the loss." *Id.* In contrast, the perpetrators' receipt of the proceeds of the fraud is an essential step in the scheme to defraud because the success of the fraud depends on it. *See Kann v. United States*, 323 U.S. 88, 94 (1944) (treating a fraud as complete when "the persons intended to receive the money had received it irrevocably"); *United States v. Fiorito*, 640 F.3d 338, 349 (8th Cir. 2011) (holding that mailings that assisted the perpetrator in cashing out the full profit of the scheme furthered an essential step in the scheme).

Ruzicka argues that there was insufficient evidence that he used the mail in furtherance of the alleged Archer Consulting fraud. He points out that the only relevant mailing that the Government proved was a mailing of a check from Archer Consulting to an account controlled by Taylor and Ruzicka. According to Ruzicka, the fraud was complete when Starkey paid Archer Consulting; the distribution of the proceeds from Archer Consulting to Ruzicka and Taylor was mere "post-fraud accounting," *Schmuck*, 489 F.3d at 714, rather than an "essential step in the scheme,"

-15-

*Bennett*, 765 F.3d at 893. Ruzicka concludes that the Government failed to prove that he used the mail in furtherance of any essential step in the allegedly fraudulent scheme.

Ruzicka overlooks the fact that he and Taylor were on trial, not Archer Consulting. While Archer Consulting may not have had an interest in the distribution payments, Ruzicka and Taylor did. The success of *their* scheme to defraud Starkey depended on distributing the proceeds from the sham intermediary, Archer Consulting, to themselves. Only then was it true that "[t]he persons intended to receive the money had received it irrevocably." *See Kann*, 323 U.S. at 94. Thus, the mailing of the check from Archer Consulting to the account controlled by Ruzicka and Taylor—for which Ruzicka does not deny there was sufficient evidence—furthered an essential step in the Archer Consulting fraud.

\*       \*       \*

In sum, none of Ruzicka's three arguments that the evidence was insufficient to support his convictions is sound. His attack on Austin's credibility and his claim that the Archer Consulting fraud did not involve use of the mail fall short of establishing that the district court erred in denying his motion for acquittal, or abused its discretion in denying his motion for a new trial, on Counts 2, 3, 4, and 10. And his claim that Sonion received the full economic benefit of its bargain falls short of establishing that the district court plainly erred in not *sua sponte* granting judgment of acquittal or a new trial on Counts 7 and 19.

## VI.

Next, Ruzicka claims that even if no single trial error is sufficient on its own to entitle him to a new trial, the cumulative impact of all errors at trial is sufficient to entitle him to a new trial. "We will not reverse based upon the cumulative effect of errors unless there is substantial prejudice to the defendant." *United States v. Gladfelter*, 168 F.3d 1078, 1083 (8th Cir. 1999). The cumulative effect of errors

amounts to substantial prejudice if "the case as a whole presents an image of unfairness which has resulted in the deprivation of [the] defendant's constitutional rights." *United States v. Steffen*, 641 F.2d 591, 598 (8th Cir. 1981).

For the reasons that we have explained, the alleged trial errors that Ruzicka identifies either were not errors or else were nonprejudicial. Certainly, they do not combine to "present[] an image of unfairness which has resulted in the deprivation of the defendant's constitutional rights." *See id.* Therefore, Ruzicka is not entitled to a new trial based on the cumulative impact of alleged trial errors.

## VII.

Turning to sentencing, Ruzicka claims that the district court miscalculated the loss that Starkey sustained as a result of the Northland fraud, leading the district court to overestimate his offense level under the guidelines.[5] When examining a loss calculation for guidelines purposes, "this court reviews the district court's legal conclusions de novo and its factual findings for clear error," keeping in mind that "the district court does not have to make a precise determination of the loss, only a reasonable estimate." *United States v. Karie*, 976 F.3d 800, 803-04 (8th Cir. 2020) (internal quotation marks omitted).

---

[5]After this appeal was submitted, the district court granted Ruzicka's motion for compassionate release under 18 U.S.C. 3582(c)(1)(A), reducing his term of imprisonment to time served. While the expiration of a term of imprisonment normally moots claims of error at sentencing, *see, e.g.*, *Owen v. United States*, 930 F.3d 989, 989 (8th Cir. 2019), in this case the district's court's offense-level calculation was relevant not only to the guidelines' imprisonment range, *see* U.S.S.G. § 5A, but also to the guidelines' fine range, *see* U.S.S.G. § 5E1.2. Because the district court's compassionate-release order left Ruzicka's fine untouched, we conclude that Ruzicka's claim is not moot insofar as it applies to his fine. *See Owen*, 930 F.3d at 990 (holding a claim moot only because the appellant had already "obtained all of the relief that he sought"). In any event, we must review the district court's loss calculation in order to resolve Ruzicka's challenge to the district court's restitution order. *See infra* Section VIII.

Under the guidelines, the loss associated with fraud is the greater of the actual loss (the loss that the victim sustained as a result of the fraud) or the intended loss (the loss that the victim would have sustained as a result of the fraud if events had unfolded as the defendant planned). *See* U.S.S.G. § 2B1.1; *id.* cmt. n.3(A)(i)-(ii). Here, actual loss is equal to intended loss because Ruzicka, Nelson, and Longtain not only planned to cause Starkey to buy their unvested shares but also executed this plan. According to the district court, the scheme caused Starkey to lose $15,528,724.95, the total amount that Ruzicka, Nelson, and Longtain caused Starkey to pay them to buy their shares and cover their estimated tax liability.

Ruzicka disagrees. He does not deny that the entire $15,528,724.95 constituted gross loss to Starkey. As he points out, however, the guidelines employ a net-loss approach that accounts for not only what the victim lost as a result of the fraud but also what the victim gained. *See United States v. Markert*, 732 F.3d 920, 932 (8th Cir. 2014) (explaining that "actual loss under the revised guideline is a net loss concept" (internal quotation marks omitted)). Ruzicka argues that the district court failed to account for the gain to Starkey of receiving the unvested shares as part of the fraudulent transactions. According to Ruzicka, the value of the unvested shares was greater than zero. Therefore, Ruzicka concludes, Starkey's actual loss was less than $15,528,724.95.

Although Ruzicka is correct that the guidelines' net-loss approach requires offsetting the victim's gross loss by the value of anything that the victim received as part of the fraud, *see United States v. Walker*, 818 F.3d 416, 422-23 (8th Cir. 2016), the value to Starkey of receiving the unvested shares as part of the fraud was zero. By committing the fraud, Ruzicka, Nelson, and Longtain provided Starkey with cause to fire them. At that point, their unvested shares would have been forfeited anyway pursuant to the Restricted Stock Agreement, leaving Starkey as the sole owner of Northland. Thus, Starkey would have been as well off receiving nothing as part of the fraudulent transactions as receiving the unvested shares. Either way, Starkey would have emerged with full ownership of Northland at no additional cost after firing Ruzicka, Nelson, and Longtain.

Ruzicka makes two arguments to the contrary. First, Ruzicka argues that it would have violated good faith and fair dealing for Starkey to enforce the Restricted Stock Agreement's forfeiture provision. Second, Ruzicka argues that the forfeiture provision conflicts with Northland's Shareholder Agreement, which provided for a 75 percent equity payout upon an employee's involuntary departure, and that under Minnesota law this conflict should be resolved against Starkey under the doctrine of *contra proferentem*.[6] *See Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 693 (Minn. 2018) (describing the canon of *contra proferentem* as "[t]he rule that ambiguous contract terms are to be construed against the drafter"). If either argument is sound, then even after the fraud Starkey would have had to pay something to acquire the unvested shares, and thus Starkey was better off receiving the shares rather than nothing as part of the fraudulent transactions.

Neither of Ruzicka's arguments is sound. The Minnesota Supreme Court has held that good faith and fair dealing preclude one party to a contract from "unjustifiably hinder[ing] the other party's performance" and that, "[s]imilarly, . . . [a] party to a contract cannot take advantage of the failure of a condition precedent when the party itself has frustrated performance of that condition." *In re Hennepin Cty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995). But it has also held that preventing a condition precedent from obtaining does not constitute "frustrat[ing]" the condition if "the prevention or hindrance . . . is caused or justified by the conduct . . . of the other party." *Nodland v. Chirpich*, 240 N.W.2d 513, 516 (Minn. 1976). Here, Ruzicka, Nelson, and Longtain were required to remain employed at Starkey as a condition precedent for the vesting of their stock under the Restricted Stock Agreement. Although this condition was not met because Starkey terminated their employment, Starkey's decision to terminate their employment was justified by their fraudulent conduct. Therefore, good faith and fair dealing would not have required Starkey to give Ruzicka, Nelson, and Longtain anything for their unvested shares after firing them for cause.

[6]For the purposes of this appeal, we assume that Ruzicka is correct that Minnesota law governs the Restricted Stock Agreement and the Shareholder Agreement.

As for the alleged conflict between the Restricted Stock Agreement and the Shareholder Agreement, Ruzicka relies on Grimes's concession that "experts and lawyers in good faith could disagree about the[ir] interaction." But Grimes also made clear that, in his opinion, "the restricted stock agreement controls." This opinion is consistent with the extrinsic evidence provided by Nelson's testimony. Nelson testified that he understood the effect of the Restricted Stock Agreement to be that Ruzicka, Nelson, and Longtain would forfeit the shares if they left or were fired by Starkey before 2016. Because the Minnesota Supreme Court has directed courts to use extrinsic evidence to resolve ambiguity before resorting to the doctrine of *contra proferentem*, *see, e.g.*, *Staffing Specifix*, 913 N.W.2d at 693-94, the district court was correct to treat the Restricted Stock Agreement as controlling.

We conclude that Ruzicka has shown no legal error or clear factual error in the district court's fraud-loss calculation. As Ruzicka concedes in his reply brief, "[t]he sole question" raised by his arguments "is whether Ruzicka, Nelson and Longtain would have had a claim on the Northland stock, even if fired for cause."[7] For the reasons that we have explained, the answer to this question is "no."

---

[7]We take this concession to constitute an abandonment of an argument that Ruzicka fleetingly alludes to near the end of his opening brief; namely, the argument that the district court should have offset Starkey's gross loss by what the unvested shares would have been worth assuming no fraud had occurred (rather than just what the unvested shares were actually worth given that the fraud occurred). Regardless, even if Ruzicka had not abandoned this argument in his reply brief, we would deem it waived because his allusion to it in his opening brief consists of no more than a single sentence without citation to legal authority. *See Reed*, 972 F.3d at 955 n.5 (refusing to "consider the merits of" claims "mention[ed]" but "not meaningfully develop[ed] or argue[d]" by the criminal defendant on appeal); *Milligan v. City of Red Oak*, 230 F.3d 355, 360 (8th Cir. 2000) ("[I]nasmuch as [the appellant's] brief does not support his assertion with any argument or legal authority, he has waived the issue and we do not address it.").

**VIII.**

Finally, Ruzicka notes that his challenges to the district court's loss calculation for guidelines purposes also apply to the district court's inclusion of the entire $15,528,724.95 in the amount of restitution that it ordered. The standard of review for loss calculations is the same for the purposes of restitution as it is for guidelines purposes: we review the district court's "legal conclusions de novo and its factual findings for clear error," *United States v. Luna*, 968 F.3d 922, 928 (8th Cir. 2020), keeping in mind that "the district court need make only a reasonable estimate of the loss," *United States v. Carpenter*, 841 F.3d 1057, 1060 (8th Cir. 2016).

Ruzicka's arguments fail as challenges to the district court's restitution order for the same reasons that they fail as challenges to the district court's offense-level calculation under the guidelines. Generally, when restitution is awarded to a victim, it should be equal to the victim's actual loss. *See* 18 U.S.C. § 3664(f)(1)(A) ("In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses . . . ."); *Luna*, 968 F.3d at 928-29 (treating actual loss as the appropriate restitution amount); *United States v. Lange*, 592 F.3d 902, 907 (8th Cir. 2010) (explaining that loss for guidelines purposes and loss for restitution purposes "are often calculated in the same manner"). As explained in Section VII, Ruzicka's arguments fail to show that the district court committed legal error or clear factual error in settling on $15,528,724.95 as a reasonable estimate of the actual loss caused by the Northland fraud. Therefore, Ruzicka is not entitled to vacatur of the district court's restitution order.

**IX.**

For the foregoing reasons, we affirm.

_____